DOWNTOWN CLUSTER OF
CONGREGATIONS,
Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

and

F Street Real Estate Company,
Intervenor.

No. 93–AA–1509.

District of Columbia Court of Appeals.

Argued Dec. 1, 1994.

Decided April 25, 1996.

---

Richard B. Nettler, Washington, DC, for petitioner.

Vanessa Ruiz, Corporation Counsel at the time of briefing, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Whayne S. Quin, with whom Louis P. Robbins, Washington, DC, was on the brief, for intervenors.

Before WAGNER, C.J., and TERRY and KING, Associate Judges.

WAGNER, Chief Judge:

Petitioner, Downtown Cluster of Congregations, petitions for review of an order of the District of Columbia Board of Zoning Adjustment (Board) granting intervenor, the F Street Real Estate Company, a use variance under the provisions of 11 DCMR §§ 1702.4,[1] 3107.2 (1994).[2] The variance permits the conversion of a building formerly occupied as a department store of Julius Garfinckel & Company (Garfinckel's) to mixed-use office, retail and service. Petitioner argues that the Board erred in granting intervenor's application for a variance because it failed to make the requisite showing

---

1. Section 1702.4 provides, in pertinent part, as follows:

   An existing department store ... shall not be converted in whole or in part to another use ... unless such conversion or replacement has been reviewed and approved by the Board of Zoning Adjustment pursuant to § 3107.2 of this title.

2. Section 3107.2 provides, in pertinent part, as follows:

   "Where, by reason of ... other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation ... would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of the property, to authorize ... a variance from the strict application so as to relieve the difficulties or hardships; Provided, that the relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the Zoning Regulations and Map."

that: (1) the subject property was affected by exceptional or extraordinary conditions; (2) it would suffer undue hardship without a variance; and (3) the variance would not have a detrimental impact on the neighborhood or the zone plan. Petitioner also argues for reversal on the ground that intervenor's hardship, if any, is self-imposed thereby defeating its entitlement to a variance. We conclude that the Board's decision is supported by substantial evidence in the record and is consistent with applicable law. Therefore, we affirm.

## I.

The property which is the subject of this dispute is located at 1401 F Street, N.W., Washington, D.C. The building, at the corner of 14th & F Streets, N.W., was used as a department store of Julius Garfinckel & Company (Garfinckel's) from the time of its construction in 1929 until Garfinckel's went into bankruptcy and ceased retail operations in August 1990. The building has been designated as a historic landmark on the District's Inventory of Historic Sites. It contains nine floors and a mezzanine above grade, three cellar levels below grade and two additional levels of mechanical space above the ninth floor. The total gross floor area of the building is 249,212 square feet, excluding the cellar and penthouse. The last recorded certificate of occupancy for the building, which is vacant, was issued for a department store. At the time the certificate was issued in 1978, the zoning regulations did not define department store.

When intervenor acquired the property in July 1988, regulations were not in effect restricting the building's usage to a department store. Its location in a C–4 district then permitted a broad range of commercial uses as a matter-of-right (*e.g.*, retail, service, arts and office). However, on May 20, 1988, the Zoning Commission published a proposed

"Downtown Shopping Overlay (SHOP) District," which provided that a department store use existing as of the effective date of the chapter could not be converted to another use in whole or in part, except as specified in Schedules A & B,[3] without approval of the Board as a special exception.[4] The SHOP provisions were incorporated into the Zoning Commission's February 3, 1989 Notice of Proposed Rulemaking and finally adopted by the Commission effective March 31, 1989. The provision required any applicant seeking to convert a department store to any other use to demonstrate, *inter alia*, exceptional circumstances making compliance with the restrictions difficult or impossible. The restriction requiring Board approval prior to conversion of a department store first appeared in the Notice of Proposed Rulemaking published on February 3, 1989.

Intervenor purchased the store in July 1988 for $38 million, assuming the rights under a prior contract, which did not go to settlement, including a lease with Garfinckel's. The contract contained a provision for Garfinckel's to have two years' free rent and to receive up to $3 million for renovations on the first four floors. In addition, intervenor agreed to remove asbestos from the building at a cost of $1.5 million. There was evidence, and the Board found, that intervenor would receive an annual rent equivalent to a nine percent (9%) return on its investment. There was also testimony that intervenor did not learn of the limitation on converting the space to office use until 1990.

In 1989, because of financial difficulties, Garfinckel's proposed to intervenor to reduce the space used by the store and relinquish the top five floors to intervenor in exchange for a rent reduction from $4,250,000 to $2,850,000, reimbursement for renovation work up to $3 million and acceleration of the asbestos abatement for the building. Garfinckel's and intervenor filed an application

3. Schedule A listed retail and personal/consumer service uses; schedule B listed arts uses and arts-related retail and support uses; schedule C listed office space uses.

4. Section 1701.5 provided as follows:
   An existing use as of the effective date of this chapter, having a Certificate of Occupancy for a retail, service or arts-related use listed in Schedule A or B, shall not be converted to uses not so listed, unless such conversion has been reviewed and approved by the Board of Zoning Adjustment pursuant to the standards set forth in section 1705 of this chapter.
   35 D.C.Reg. 3699 (1988).

with the Board for a special exception from the SHOP regulations pursuant to § 1701.5 (1988) and § 1706 (1989) which the Board granted on April 19, 1990. The Board's approval was specific to Garfinckel's. The order permitted office use on floors five through nine, a ground-floor office lobby, and office use in tandem with the department store in the common areas. After obtaining the exception, intervenor removed the asbestos from the building and commenced remodeling. Garfinckel's filed for bankruptcy on June 21, 1990, ceased active retail use of the building on August 25, 1990, and vacated the building completely on December 21, 1990.

In October 1990, intervenor wrote to twenty-seven department stores, which included, with one exception, all the known department store operators in the United States, about the availability of the building for lease. Intervenor received six responses, none of which were positive. In 1990, the May Company, the parent company of Lord & Taylor and owner of Hecht's department stores, expressed an interest in the building through Garfinckel's management. Some eight months of negotiations ensued with the May Company during which various proposals were considered, and District of Columbia representatives, including the Mayor, became involved. A tax rebate to intervenor by the city was proposed to help underwrite the cost of the department store, but intervenor and the May Company were unable to reach an agreement.[5] In June 1992, the May Company proposed a ten-year lease, with five ten-year options. Under this proposed lease, the May Company would pay rent in the amount of $550,000 a year for the first two years, $500,000 in years three through five, $575,000 in years six through ten, and during the optional period would increase rent fifteen percent above the prior rent, or approximate-ly three percent per year. The proposed lease would have permitted the May Company, at its discretion, to reduce its space to 50,000 square feet or cease operations at any time.[6] This proposal was premised upon receipt of a two and three-fourths percent (2.75%) rebate from the District of Columbia of the sales taxes paid by the May Company (Lord & Taylor) and projected sales of $23 million during the first year with an annual increase in sales of seven and one-half percent (7.5%). However, intervenor's witness testified that his economic experts estimated potential sales of only $15–19 million the first year and an annual increase of four percent (4%). The proposal also called for intervenor to pay for external repairs, real estate taxes and insurance, the latter two estimated at $65,000 and $415,000, respectively. According to intervenor's witness, this proposal would yield a return on investment of only approximately six percent (6%) and a substantial long-term loss.

Intervenor filed with the Board an application for a use variance to convert the building to a mixed-use retail and office building, providing a floor area equivalent to a minimum of 2.0 floor area ratio (FAR) with at least 56,460 gross square feet devoted to preferred retail and service uses.[7] Intervenor proposed to use the ground floor, the first cellar, mezzanine and/or second floor for retail use, consisting of approximately 73,000 square feet, from which a minimum of 56,460 square feet would be devoted to retail use. The remainder of the building would be used for office space and underground parking with access through the garage of the adjoining property.

Intervenor's architect testified at the hearing on the application that there was no building in the vicinity affected by the same

---

**5.** Intervenor contacted other retail brokers about the availability of the building, including store operators in the United States, Japan, France and England. Although some had an active interest in locating in other cities, none were interested in using the property as required under the zoning regulations.

**6.** The proposed lease provided for the lease to be null and void if the May Company "went dark" for thirty days and expressed its intent not to reopen. If it stated it would reopen, intervenor

was required to keep the premises available for lease to the May Company for one year.

**7.** Initially, intervenor took the position that because the building was vacant, the SHOP overlay restrictions did not apply. However, the city officials informed intervenor that a variance would be required. The proceedings in that case have been deferred pending disposition of the present proceedings.

combination of conditions as this building. Specifically, he testified that the size of the site, 28,230 square feet, was substantially less than the other two existing department stores; that the combination ceiling height and landmark status makes it unlikely that the maximum 10.0 FAR permitted can be achieved; that the building's lack of vertical circulation presents a problem in light of present-day requirements of department stores for escalators and level-to-level visibility.

B. Thomas Miller, Jr., a senior manager at Arthur Andersen, who prepared a market analysis for retail and office use of the site, testified that it was his opinion that department stores would not be interested in leasing the building; that nine percent (9%) was a reasonable expected return; and that 56,000 square feet of retail space, instead of a department store use of 90,000 square feet, would yield intervenor, together with office uses on other floors, a seven and four-tenths percent (7.4%) average return and a return of three and nine-tenths percent (3.9%) from 1992 through 2002. Mr. Miller testified that the May Company's rent proposal, coupled with office rental of the remaining space, would have provided a rate of return of only six percent (6%).

Hanne Merriman, intervenor's retail expert, testified that it was important to rent the building to a single, upscale, anchor store, as did John Asadoorian, director of retail leasing for Carr Real Estate Services.[8] However, Asadoorian testified that, in his opinion, it was not possible to secure a department store, although there should be potential lessors for a smaller space of 50,000 square feet.

The Office of Planning (OP) recommended conditional approval of the application, agreeing that the small lot size, small floorplate and inability to secure a department store created a hardship for intervenor. OP's support for the application was conditioned on the Board providing that the building maintain a minimum of 2.0 FAR, or 56,460 square feet, of retail, service, arts and entertainment uses, on at least three levels of the building, and that intervenor consult with the District government concerning the nature of the proposed occupancy and the goal of providing a mixed-use building with a major anchor-retail component before executing an agreement. OP also submitted to the Board a copy of a Memorandum of Understanding between intervenor and the District of Columbia whereby intervenor agreed to use good-faith efforts to secure retail tenants.

Ellen McCarthy, an expert in land use and urban planning and President of the National Capital Chapter of the American Planning Association, testified for petitioner that the site is not subject to extraordinary conditions, that intervenor is not suffering an "exceptional and undue hardship," and that granting intervenor relief would cause a detriment to the public good and impair the intent, purpose and integrity of the zone plan. She pointed out that department stores have massive regional advertising budgets, name recognition, and established customers which can produce revenues to the District and provide customers to adjacent retailers.

Sara Maddux, Chairperson of Advisory Neighborhood Commission 2A, testified in opposition to the application, stating that a department store would bring more people into the area. Advisory Neighborhood Commission 2F, within which the site is located, submitted a letter in opposition essentially because it contended that intervenor failed to demonstrate a good-faith effort to obtain suitable retail tenants for an anchor store and proposed insufficient retail space.

Reverend John Mack, President of the Downtown Cluster of Congregations, and Terrence Lynch, Executive Director of the Downtown Cluster of Congregations, opposed the application. Rev. Mack testified that a department store would provide a high percentage of jobs to District residents and increase tax revenue. Mr. Lynch recounted a conversation he had with Barry Kaufman, an executive of the May Company. According to Lynch, Kaufman informed him that

---

8. An "anchor store" is described as a single retail store having between 60,000 and 90,000 square feet of gross leasable area and which is operated under a single certificate of occupancy. 11 DCMR § 1799.1 (1994).

the May Company believed the site was appropriate for a department store, that the May Company had made a "high-end" offer to intervenor for between 100,000 and 120,000 square feet, had offered to spend $13–14 million on interior renovations, and thought they had worked out a deal which included some tax credits to intervenor by the District government.[9]

The Board concluded that intervenor had met its burden of justifying its application. The Board found that the small size of the lot and floorplate, the restricted size of the structure due to its landmark status, the limitations on vertical access and visual connections and declining and changing market conditions for department stores combined to create an exceptional and extraordinary condition inherent in the site. The Board further found that intervenor had made reasonable efforts to attract a department store tenant without success; that the hardship experienced was not self-created since the department store restriction was not adopted until after intervenor purchased the site; that the goals of the Downtown Development District (DDD) would be met by conversion, particularly intervenor's willingness to locate an anchor tenant; and that the square-foot limitations adopted by the Zoning Commission for either an anchor store or a major retail component were arbitrary.

## II.

■ We address preliminarily intervenor's argument that petitioner lacks standing to petition for review. Intervenor contends that petitioner failed to show any "specific right or interest" affected by the application. Intervenor contends that petitioner's interest is simply a general concern for the best interest of the downtown community which is insufficient to establish standing.

Petitioner's executive director, Terrence Lynch, represented that it is an association of twenty-eight churches, three of which are within two blocks of Garfinckel's. According to Mr. Lynch, these churches have had a longstanding presence in the area and own significant parcels of real property in downtown. He contended that the churches were the cornerstone of the downtown neighborhood. A proposed plan which would undermine the DDD would adversely affect the churches' ability to provide programs for residents, office workers, and shoppers, according to Mr. Lynch. The Board granted petitioner party status.[10]

This court has adopted a three-pronged standard to determine standing to seek review of an administrative decision:

> A petitioner must allege (1) that the challenged action has caused him injury in fact, (2) that the interest sought to be protected by petitioner is arguably within the zone of interests protected under the statute or constitutional guarantee in question, and (3) that no clear legislative intent to withhold judicial review is apparent.

*Dupont Circle Citizens Ass'n v. Barry,* 455 A.2d 417, 421 (D.C.1983). The impact of the challenged action on at least some of petitioner's members, as far as we can glean from the record, would appear to affect them directly. The neighborhood churches have asserted a direct and negative impact upon their programs if the character of the neighborhood is not maintained consistent with the DDD. They contend that any action adverse to maintaining and expanding a "living downtown" threatens the viability of the churches, and affects adversely their membership, pro-

---

9. There was other testimony in opposition to the petition. Ruth Burness, President of the Resident Council of Thomas House, a 205–unit continuing care retirement community, located at 1330 Massachusetts Avenue, N.W., submitted a petition signed by fifty-four residents opposing the application. She testified that a department store is critical to the success of retail downtown and to attracting tourists downtown. Richard Rosenberg, president of Storm Shoes, Incorporated, located at 435 11th Street, N.W., submitted a retail survey of the central business district, and testified that a department store is necessary to maintain smaller retail uses. He also testified that, in his experience, the intervenor's marketing efforts were insufficient to attract a department store tenant.

10. One Commissioner expressed reservations about whether petitioner had the type of interest required for party status or whether petitioner simply sought to defend the DDD. However, the Commissioner concluded that practical considerations would lead him to err on the side of allowing party status.

grams, services, and property values. Such interests fall within the zone of interest sought to be protected by the regulation for which intervenor applied for an exception. *See Speyer v. Barry,* 588 A.2d 1147, 1160 (D.C.1991). Therefore, petitioner's grievances cannot be characterized as generalized. *See id.* We have said that "[a]n organization has standing to sue when one of its members has standing." *Id.* at n. 25. In light of these considerations, we are not persuaded that petitioner lacks standing to seek review of the Board's order.

### III.

■■■■ Petitioner argues that the Board's decision is not supported by substantial evidence in the record and that its conclusions are premised upon a misapplication of the law. Our scope of review is a narrow one which requires this court to determine whether the Board's findings are supported by substantial evidence in the record and whether its conclusions flow rationally from those findings. *Association for Preservation of 1700 Block of N Street, N.W. v. District of Columbia Bd. of Zoning Adjustment,* 384 A.2d 674, 677 (D.C.1978). The Board's interpretation of zoning regulations is controlling unless it is plainly erroneous or inconsistent with the regulation. *Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 320 A.2d 282, 286 (D.C.1974). A decision of the Board will not be set aside unless it is clearly erroneous or inconsistent with the zoning regulations. *Silverstone v. District of Columbia Bd. of Zoning Adjustment,* 372 A.2d 1286, 1288 (D.C.1977), *vacated in part and amended on other grounds,* 396 A.2d 992 (1979).

■■■■ Petitioner argues that intervenor failed to demonstrate that some exceptional or extraordinary condition affected the property and that application of the regulations would result in undue hardship to intervenor.

An applicant must demonstrate that application of the zoning regulations would result in "practical difficulties" before an area variance can be approved or "undue hardship" before a use variance can be granted. *Palmer v. District of Columbia Bd. of Zoning Adjustment,* 287 A.2d 535, 542 (D.C.1972). Because "an area variance ... does not alter the character of the zoned district, whereas a use variance seeks a use ordinarily prohibited ... a more stringent showing is warranted with respect to the more drastic relief inherent in a use variance." *Id.* at 541. Here the Board applied the more stringent standard for a use variance: [11]

> A landowner must meet three requirements for a use variance: (1) unique physical aspect or "other extraordinary or exceptional situation or condition of a specific piece of property," (2) undue hardship, and (3) no harm to the public or to the zone plan.

*Monaco v. District of Columbia Bd. of Zoning Adjustment,* 407 A.2d 1091, 1096 (D.C. 1979); *see also* 11 DCMR § 3107.2 (1992).

■■ In determining that intervenor met the first prong of the test, the Board stated:

> The Board concludes that the size of the lot, the relatively small floorplate of the building, the limited total area of the building, the limitations on vertical access, the absence of a direct Metrorail connection and the adoption of the Downtown Development District regulations limiting this property to a single use, combine to create exceptional and extraordinary conditions affecting this property.

Order at 19. These findings are based upon substantial evidence in the record, and we find no basis to disturb them.

■■■■ Petitioner also argues that intervenor has not demonstrated that it has suffered any undue hardship. To demonstrate undue hardship, an applicant must prove that

---

11. The Board stated:
  There is no clear legal principle to determine whether the standards for a use variance or area variance should apply to this application. The application proposes uses which are all permitted as a matter of right in the DD/C–4 District and the relief is therefore similar to an area variance. In any event, the Board concludes that the applicant has met the burden of proof for a use variance, which is the more rigorous of the variance standards.
  Order at 19. We need not resolve which standard applies, since we conclude that the Board did not err in its decision applying the greater standard of proof.

the property cannot be "put to any conforming use with a fair and reasonable return arising out of the ownership thereof." *Palmer, supra,* 287 A.2d at 542. There was substantial evidence in the record to support the Board's conclusion that intervenor had made reasonable efforts, nationally and internationally, to locate a department store to lease the premises which would provide a reasonable rate of return. According to the evidence, only a single company, the May Company, expressed any interest in locating a department store on the property. This proposal contained many contingencies beyond the control of intervenor and the May Company. There was evidence that in order for the proposed lease to produce even a limited projected return, the following would have to occur: (1) the store would have to have sales of $23 million per year; (2) it would be necessary that the store continue to occupy the entire leased premises for the duration of the lease and not exercise its rights to reduce or terminate its occupancy prematurely; and (3) the Council of the District of Columbia would have to enact legislation to provide a tax abatement for the benefit of intervenor, which the Mayor would have to approve and the Congress must allow to stand. In light of these contingencies, the projection of any reasonable rate of return from the May Company's proposal is speculative at best. The Board properly could conclude on this record that intervenor made reasonable efforts to locate a department store to lease the site, that none could be located which offered a reasonable rate of return to the owner, and that these circumstances created an undue hardship for intervenor.

■ Petitioner also argues that the use variance will be detrimental to the zone plan and that intervenor failed to prove that there would be no detrimental impact on the area or the zoning plan. Absent an identified tenant, petitioner contends that the impact cannot be assessed properly. The Board concluded that

> the intent, purpose and integrity of the regulations are maintained because the significant specialty, attractor-type retail component which will be included in the

building will accomplish the same purpose as a department store.

According to petitioner, however, the grant of the use variance will undermine the basic objectives of the Comprehensive Plan and the retail component of the DDD. He points out that witnesses for both sides stressed the importance of a strong retail anchor for the site and that intervenor had not yet identified any.

Here, the Board found that the purpose and integrity of the objectives of the plan were met because of the "significant specialty attractor-type retail component" to be included in the building. Intervenor was unable to present a specific tenant to the Board for consideration because it deemed it inappropriate to approach and obtain a commitment without knowing whether the variance would be secured. The Board found some assurance in the Memorandum of Understanding which intervenor entered with the Executive Branch of government under which intervenor obligated itself to find an appropriate specialty, anchor-type tenant and to confer with the executive officials to assure that the tenant is consistent with the goals agreed upon. The Board also imposed conditions upon the variance as to usage of the building consistent with intervenor's proposal. Under the circumstances, we cannot say that the Board erred in concluding that the use variance would not have a detrimental impact on the zone plan.

### IV.

■ Finally, petitioner argues that intervenor's hardship, if any, is self-created. The Board concluded, however, relying on *Clerics of Saint Viator, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 320 A.2d 291 (D.C.1974), that intervenor did not create its own hardship and is therefore not disqualified from appropriately seeking variance relief. The Board explained:

> In the subject case, the historical and existing market conditions and circumstances affecting the decline in traditional downtown department stores has made it impossible to find another user for the building which strictly complies with the Zoning Regulations. In addition, the regulations

applicable at the time of the applicant's purchase of the building permitted matter of right substitution of retail uses and change to office use as a special exception with BZA approval, as was previously approved by this Board.

Order at 19–20. Petitioner argues that internal decision-making, not external development, is the principal reason why the building no longer fits intervenor's purposes. According to petitioner, the record shows that intervenor had constructive, if not actual, knowledge of the restrictive uses for the site, including the conditions which intervenor now says are extraordinary and exceptional.

There is substantial evidence that intervenor had no actual knowledge of the proposed restrictive regulations and the dates and provisions of the SHOP regulations. It was not shown that intervenor had constructive knowledge of the kind of restrictions which would be imposed on the property at the time it was acquired. As the Board found, the SHOP regulations, when first set for hearing, did not contain the provision that a department store could only continue as a department store unless the Board granted a variance.

Petitioner argues that, according to intervenor's own experts, at the time intervenor purchased the site in July 1988, the lot was no larger than it is today, the building had no greater floorplate or vertical access, the building had been designated a historic landmark, no Metro connection was proposed for the site, and market conditions for department store uses in the downtown area of the District of Columbia had been declining. On the other hand, the evidence shows that when intervenor purchased the property, there was an operating department store tenant under a lease that resulted in a reasonable return on investment. Intervenor had no expectation that the long-term tenant would go out of business and that no replacement willing to pay a reasonable rent could be located for the unique site under the new zoning restrictions. In addition, the Board

found, and the evidence supports its findings, that the historical and existing market conditions and circumstances affecting the decline in traditional downtown department stores has made it impossible to find another user for the building which complies with the zoning regulations. Under the circumstances, we reject petitioner's argument that the Board erred in finding that the owners did not create their own hardship in this case. *See Foxhall Community Citizens Ass'n. v. District of Columbia Bd. of Zoning Adjustment,* 524 A.2d 759, 762 (D.C.1987).

For the foregoing reasons, the order appealed from hereby is

*Affirmed.*