Salvatore **GORGONE**, Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,** Respondent.

No. 08–AA–231.

District of Columbia Court of Appeals.

Argued May 12, 2009.

Decided June 11, 2009.

Simon M. Osnos, Falls Church, VA, for petitioner.

Mary T. Connelly, Assistant Attorney General, with whom Peter J. Nickles, Acting Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before WASHINGTON, Chief Judge, OBERLY, Associate Judge, and KING, Senior Judge.

OBERLY, Associate Judge:

Salvatore Gorgone's tenant, Paul Luna, applied for a certificate of occupancy ("CO") to operate a "gourmet shop" out of the basement of a rowhouse owned by Gorgone. The rowhouse is located at 1417 17th St., N.W. in a residential zone where a "gourmet shop" is not permitted as a matter of right. The Zoning Administrator ("ZA") of the Department of Consumer and Regulatory Affairs ("DCRA") denied Luna's application, finding that any grandfathered right to make a nonconforming use of the basement had been abandoned. Gorgone appealed the denial to the Board of Zoning Adjustment ("BZA"), which affirmed. Finding no error in the BZA's decision, we affirm.

## I. Statutory Framework.

Prior to discussing the facts of this case, it is helpful to review briefly the applicable statutory framework. We begin with 12A DCMR § 110.1, which provides, with exceptions not applicable here, that "no person shall use any structure, land, or part thereof for any purpose other than a one-family dwelling until a Certificate of Occupancy has been issued to that person stating that the use complies with the Zoning Regulations and related building, electrical, plumbing, mechanical and fire prevention requirements."[1] A certificate of occu-

---

1. Except where specified otherwise, we cite the 2003 version of Title 11 of the Municipal Regulations and the 2004 version of Title 12A of the Municipal Regulations because those

pancy is an "enforcement tool" that is used by administrative officers "to check proposed uses, as well as proposed structures, against the [applicable] ordinances." PATRICIA E. SALKIN, AMERICAN LAW OF ZONING § 1.03[4][d], 1–54 (5th ed. 2008). A CO cannot authorize a use that does not comply with the requirements set forth in § 110.1. *See Kuri Bros. v. District of Columbia Bd. of Zoning Adjustment,* 891 A.2d 241, 247–48 n. 6 (D.C.2006) (a CO "construed to authorize . . . a use" that is not permitted by the zoning laws is "invalid and subject to revocation as having been issued in error"); *see also, e.g.,* 12A DCMR § 110.5.1 (stating that DCRA "shall . . . revoke[ ]" CO where "actual occupancy does not conform with that permitted"); 12A DCMR § 110.1 (2009) ("Issuance of a certificate of occupancy shall not be construed as an approval of a violation of the provisions of the applicable Construction Codes, Zoning Regulations or other laws or regulations of the District.").

As a general matter, the District's zoning regulations forbid property that is located in a residential district (such as Gorgone's) to be used (as Luna proposed) commercially. *See* 11 DCMR § 350.4. Notwithstanding this general rule, uses that were valid at the time the zoning regulations were adopted were allowed to continue even if those uses no longer conformed to the regulations. D.C.Code § 6-641.06a (2001); 11 DCMR § 2000.4. "The government recognizes nonconforming uses in derogation of the general zoning scheme in order to protect the interests of property owners." *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1342, 1345 (D.C. 1981).

Like many other rights, however, the right to a nonconforming use may be abandoned. "To establish abandonment, one must demonstrate (1) the intent to abandon and (2) some overt act or failure to act which carries the implication of abandonment." *Id.* We construe the "[d]iscontinuance for any reason of a nonconforming use . . . for a period of more than three (3) years . . . as *prima facie* evidence of no intention to resume active operation as a nonconforming use." 11 DCMR § 2005.1.

## II. Facts.

With the statutory framework in mind, we turn to the largely undisputed facts of this case. The property that is the subject of Gorgone's petition is located in a residential district, where, since the enactment of the zoning regulations in 1958, no type of food sales are or ever have been permitted as a matter of right. As the BZA found, at "some point before" the zoning regulations came into effect, "a retail food establishment selling uncooked, prepared food was lawfully established in the basement" of what is now Gorgone's property. For the next forty years, the basement continued to be used by various owners as a "delicatessen" in the traditional sense of the word; "[s]pecifically, at no time during" the period from 1958–1998 "was there any large-scale cooking of food done on the premise[s]." When Gorgone "purchased the property in 1994 . . . the basement was occupied by a retail food business operating as a 'delicatessen with no seating,' as per its" CO.

In 1998, Ming Zin Zhang took over the lease to the basement. Operating as Chef's Express, Zhang obtained a CO that authorized Zhang to use the basement as a

versions were in effect in September 2006, when the ZA formally denied Luna's applica-

tion.

"Delicatessen (No Seats)." The BZA found that Zhang then "renovate[d] the basement[,] introducing a commercial-style kitchen with cooking equipment, exhaust fans, and vents." After "the renovation was complete, Chef's Express expanded its menu to include cooked items and started to receive large bulk food deliveries of raw foods.... The raw food was prepared—chopped, diced, etc.—and cooked on the premise[s]."

Zhang operated Chef's Express from 1998–2005. The BZA found that at all times during this seven-year period, Chef's Express "prepared and cooked ... food on the premise[s]," operating what Gorgone, Zhang, and the BZA term a "Chinese carry-out." In 1999, approximately one year after Chef's Express opened, and twice again in 2003, the DCRA and the D.C. Department of Health issued Notices of Infraction stating that "the food preparation activities being carried out on the premises were not within the scope of the delicatessen use authorized by the [CO] and that the operation was actually a carry-out." In July 2003, the DCRA rejected Zhang's application for a CO to use the basement as "a Chinese Food Carry–Out." Ultimately, in November 2005, Zoning Administrator Bill Crews revoked Chef's Express's CO, explaining that Chef's Express was engaging "in activities that do not conform to the location and use permitted in the existing" CO.

Unable to operate Chef's Express because the CO had been revoked, Zhang left, and Gorgone leased the basement to a new tenant, Paul Luna. Luna applied to the DCRA for a CO to operate a "gourmet shop" out of the basement. The record does not tell us what precisely a "gourmet

shop" is, so we assume, as do the parties, that a gourmet shop is a commercial food establishment that sells prepared foods. In the end, that silence is immaterial because Crews's denial of the CO application had nothing to do with any feature of the gourmet shop.

Rather, Crews concluded that the right to make *any* nonconforming use of Gorgone's basement had been abandoned by the prolonged use of the basement as Chef's Express. Relying on WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986), Crews decided that Chef's Express was not a delicatessen.[2] And because Gorgone's basement was not operated as a "delicatessen" for more than three years prior to the date when Luna applied for the CO, Crews reasoned that under 11 DCMR § 2005.1, the right to use the property in any nonconforming manner was abandoned.

### III. Discussion.

#### 1. Standard of Review.

 Our review of the BZA "is limited. We defer to the BZA's interpretation of the zoning regulations unless its interpretation is plainly wrong or inconsistent with the governing statute. We must affirm the BZA's factual findings so long as they are based on substantial evidence in the record. Ultimately we must sustain the BZA's action unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. However, although we accord weight to the agency's construction of the statutes which it administers, the ultimate responsibility for deciding questions of law is assigned to this court." *Kuri Bros.*, 891 A.2d at 244–

---

**2.** Webster's defines "delicatessen" as "1. ready-to-eat food products (as cooked or processed meats, cheeses, prepared salads, canned foods, preserves, and relishes); 2. a store where delicatessen are sold either to be taken out or to be eaten on the premises (as in sandwiches)."

45 (internal quotation marks and citations omitted).

## 2. Merits.

■ Gorgone's first argument is that the "District's novel application of the Webster's Dictionary definition to decide that prior operation of a 'Chinese carry-out' at the premises differed from, and resulted in discontinuance of, the permitted delicatessen use, was clearly erroneous or arbitrary." Gorgone's second argument is that Crews and the BZA "engaged in unofficial rule-making or prohibited retroactive application of the new definition." We reject both contentions.

■ In the first place, 11 DCMR § 199.2 expressly states that "[w]ords not defined" in the zoning regulations "shall have the meanings given in *Webster's Unabridged Dictionary*." As a result, the argument that Webster's was out of bounds to Crews is without merit. Gorgone complains that the DCRA in the past allegedly had not consulted the dictionary to interpret whether a business owner was operating outside of the CO. Even assuming that were true, that does not change the result. Gorgone does not have an entitlement to have the government ignore the letter of the law in favor of unstated practice, and the failures of prior zoning administrators to heed § 199.2 do not bind the hands of zoning administrators who later wish to give the law its full effect, at least where, as here, there is no viable claim of laches, estoppel, or the like.

Moreover, although we appreciate that some cases may present closer questions, Chef's Express plainly was not a deli. We believe that Commissioner Bjorge of the Advisory Neighborhood Commission, testifying before the BZA, put it well when he said that the change from a deli to Chef's Express was like having "your neighbor one day flying a kite and [then] on the next day they had purchased a helicopter."

Importantly, Gorgone does not seriously contest Bjorge's analogy. Throughout his brief, Gorgone never claims that Chef's Express was a deli within any commonly accepted meaning of the word, instead referring to Chef's Express as a "carry-out," or a "carry-out type business[ ]." At oral argument Gorgone disclaimed any desire to run a food establishment similar to Chef's Express out of his basement, which further demonstrates that Gorgone concedes that whatever Chef's Express was, it was not a deli.

Even if Gorgone had argued that Chef's Express was a "deli," there is ample support—certainly, substantial evidence—in the record for the BZA's contrary conclusion. We see nothing unreasonable about the BZA's finding that, generally speaking, a Chinese carry-out's on-site cooking inherently "results in a Chinese carry-out being a much more intense use than a delicatessen, with greater impacts on the surrounding neighborhood in the way of odors, trash, and vermin." Moreover, numerous complaints in the record about Chef's Express confirmed that Chef's Express indeed had a much greater impact on the neighborhood than the food establishments that had operated out of the basement for the forty years before Zhang moved in.

Gorgone's notice-type arguments also are misguided. Crews may or may not have been the first ZA to rely on the dictionary definition of "deli" to revoke a CO; the record is unclear on that point. What the record does show is that Crews was not the first to identify a problem with Chef's Express. Indeed, a little more than one year after Chef's Express opened, the DCRA, citing the then-current regulation regarding certificates of occupancy, *see* 11 DCMR § 3203.1 (1995), issued a Violation

Notice directing Zhang to "obtain [a] certificate of occupancy for [a] restaurant." In 2003, the DCRA issued another Violation Notice to and levied a fine on Zhang for operating a carry-out without proper authorization. Thus, the District's concern that Chef's Express was operating outside of its authorization did not originate with Crews.

Nor did Crews invent the notion that using property in a manner that went beyond the use contemplated by the CO would result in revocation of the CO. The CO that was issued to Zhang itself advised that the CO was valid "ONLY ... for the purpose(s) indicated above," [*i.e.*, a deli], and warned that "ANY CHANGE in the type of business ... [would] render this Certificate VOID." These warnings were consistent with the District's established law at the time, which "[e]ffective August 5, 1983" had said that "improvements to [nonconforming] structures could not increase or extend existing nonconformities or create new ones." *Beins v. District of Columbia Bd. of Zoning Adjustment,* 572 A.2d 122, 124 (D.C.1990).

Gorgone makes much of the fact that prior to 2003, the District treated carry-outs as delis for the purposes of business licensing and health regulations, and stresses that the record does not disclose whether the District had previously relied on the dictionary definition of "delicatessen" to revoke a CO that was issued to a carry-out establishment. As we discussed above, however, the facts and the law clearly were sufficient to put Gorgone on notice that extending an authorized use was not allowed. That is all the notice the law requires.

We recognize that the District's regulation of food establishments has not been a model of clarity. Thus, according to Crews, although a deli is not a fast food restaurant, many entities that are operated as delicatessens "really are carry outs," and, in turn, "in [Crews's] definition, a carry out is a fast food restaurant." In the end, Crews believes that Quiznos, Potbelly, and "even Subway" are delis—even though Quiznos and Potbelly toast their bread, and even though Subway "has some toasted or warm things"—because all three "mak[e] sandwiches." But Crews acknowledged that the BZA previously determined Blimpie to be a "fast food restaurant," and Cluck–U and Birdland were found by zoning officials to be "restaurant[s]." Crews testified before the BZA that he "consider[ed] ... sandwich making" to be a "delicatessen," although Crews conceded that a deli "could have a lot of carry out using the term generically."

It is difficult to deny that these distinctions have somewhat of an "I–know–it–when–I–see–it" quality. But be that as it may, there is no question that Chef's Express was not a deli and Gorgone does not claim that he lacked notice that the DCRA believed that Chef's Express was operating beyond the authorization supplied by the 1998 CO. Gorgone does not cite any cases suggesting that an applicant for a CO may present what amounts to a facial challenge to a procedure used by the BZA, and we decline the invitation to so hold here. Gorgone cannot rely on the rights of others to avoid a result that is just as to him.

As to those who perhaps are closer to the line than Gorgone, we hope that the Streamlining Regulation Act of 2003, D.C.Code § 47–2851.01, *et seq.* (2003), will reduce the potential for inconsistent treatment of food establishments. This Act (and its implementing regulations), which Gorgone appears to find clear, seems to provide better guidelines for owners of food establishments. *See* D.C.Code § 47–2851.03(a)(f)(2)(A) (2003) (eliminating as

'separate license categories' licenses for, among other things, "Delicatessen," and stating that such businesses "shall receive a Public Health: Food Establishment Retail license endorsement" in the future). These new provisions promise to bring greater clarity to an important area of zoning regulation.

### IV. Conclusion.

The decision of the Board of Zoning Adjustment is

*Affirmed.*