*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-1114

COMMITTEE OF NEIGHBORS DIRECTLY IMPACTED BY LAMB APPLICATION, PETITIONER,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, RESPONDENT,

and

LATIN AMERICAN MONTESSORI BILINGUAL
PUBLIC CHARTER SCHOOL, INTERVENOR.

Petition for Review from the District of Columbia
Board of Zoning Adjustment
(Nos. 19581 & 19581-A)

(Argued March 14, 2019                 Decided October 31, 2019)

*Aristotle Theresa* for the petitioner.

*Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, filed a statement in lieu of a brief for the respondent District of Columbia Board of Zoning Adjustment.

*Alana V. Rusin*, with whom *Cary R. Kadlecek* was on the brief, for the intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*:  Intervenor, Latin American Montessori Bilingual Public Charter School ("LAMB"), submitted an application to the Board of Zoning Adjustment (the "BZA" or "Board") for a "special exception" for the property located at 5000 14th Street Northwest (the "Property").[1]  LAMB requested that the BZA allow it to operate a public charter school at the Property, which is located in an R-16 residential zone, where operation of a public charter school is not permitted as a matter of right.  After extensive public review including four public hearings, the Board approved the application, finding that the operation of a public charter school is consistent with the overall purpose and intent of the R-16 Zone.  *See generally* 11-U DCMR § 205.2 (2016).[2]  Petitioner, Committee of Neighbors Directly Impacted by LAMB Application ("CNDI-LA"), which was granted party status before the Board and participated in the approval process, petitions for review of the Board's order, arguing that it is contrary to the

---

[1]  The Board is empowered to hear requests for special exceptions from the zoning regulations, and may grant such special exceptions that will: (a) be "in harmony with" the zoning regulations' "general purpose and intent"; (b) not tend to adversely affect "the use of neighboring property"; and (c) meet special conditions as specified.  11-X DCMR § 901.2 (2016).  *See also* D.C. Code § 6-641.07(d) (2012 Repl.); 11-Y DCMR § 100.3 (2016).

[2]  We note that the text of the regulations cited in this opinion have not changed since the events at issue took place.

stated intent and purpose of the R-16 Zone, which is intended to be almost exclusively a low-density, single-family dwelling residential zone. *See* 11-D DCMR § 900 (2016). CNDI-LA also raises three procedural issues regarding the Board's approval process. We affirm.

## I. Factual and Procedural Background

On June 29, 2017, LAMB, along with another organization, Building Hope Parkside Foundation, submitted an application for a special exception, pursuant to 11-U DCMR § 205.1(a), to establish a public charter school on the Property and to co-locate with an existing private school, Kingsbury Center ("Kingsbury"). LAMB's goal is initially to share the Property with Kingsbury, with the intent to eventually become the sole occupant, with Kingsbury vacating the Property completely. The Property is located in the Sixteenth Street Heights neighborhood, designated as an R-16 Zone, the only zone in the designated R-Use Group D, which encompasses a primarily residential neighborhood of row houses and single-family homes, with some religious institutions.[3] The Property spans

---

[3] The zoning regulations categorize the R zones into four R-Use Groups: A, B, C, and D. *See* 11-U DCMR § 200.2 (2016). Each R-Use Group has subcategories comprising at least one of twenty-one R zones. Unique among the other three R-Use Groups, R-Use Group D has only one R zone, R-16.

approximately four acres of land area and is improved with a three-story-plus-basement building constructed circa 1907; originally used as a retirement home, it has been occupied by Kingsbury as a private school since 2000. Despite the Property being in the R-16 Zone, the BZA granted Kingsbury a special exception to operate a private school on the Property in 2000. The R-16 Zone allows for low-density residential and institutional uses, 11-U DCMR § 204.1 (2016), and only allows the establishment of a public charter school pursuant to a special exception, *id.* § 205.1. Accordingly, LAMB filed an application for special exception with the BZA.

Following four hearings on October 4, November 15, and December 20, 2017, and February 14, 2018, the BZA approved the application conditioned upon LAMB's compliance with thirty-five conditions, which the BZA concluded would mitigate any adverse impacts of the increase in students at the school. The conditions were extensive and detailed, and were intended to act as safeguards against potential disruption to the neighborhood. The conditions included, for example, a traffic circulation plan to orient automobile traffic entering and exiting the Property to minimize idling and spillover into the neighborhood; a requirement that any lighting be directed toward the Property and not exceed what is required by law; staggered start times to minimize traffic; and the planting of evergreen

trees around the perimeter of the Property to minimize playground noise. Condition thirty also required LAMB to notify CNDI-LA and Advisory Neighborhood Commission ("ANC") 4C before seeking a certificate of occupancy to occupy the entire Property (following Kingsbury's departure) and to further demonstrate to the District Department of Transportation ("DDOT") and the Zoning Administrator that it is in compliance with the other thirty-four conditions. The Board ultimately concluded that approval of the special exception with the thirty-five conditions would not adversely affect neighboring properties due to traffic, parking, noise, design, or lighting, and found the application in harmony with the intent of the R-16 Zone, which is to conserve a low-density, single dwelling unit neighborhood, and limit the expansion of non-residential uses. *See* 11-D DCMR § 900.1.

On June 21, 2018, following the Board's approval, CNDI-LA filed a motion for reconsideration alleging a lack of evidence in the record and a lack of a fair proceeding to support the Board's decision. The Board considered the motion at a public hearing on July 18, 2018, and voted to deny the motion. The Board issued a subsequent, amended order acknowledging CNDI-LA's concerns, but stating that it previously conducted "an extraordinarily deliberative process," reviewed over 150

exhibits, and heard testimony at four public hearings, and found its order supported by the record evidence. This petition for review followed.

## II. Legal Framework

Our review of a BZA decision is limited. *Ait-Ghezala v. District of Columbia Bd. of Zoning Adjustment*, 148 A.3d 1211, 1215 (D.C. 2016). We will affirm a BZA decision unless "its findings and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of its jurisdiction or authority; or unsupported by substantial evidence in the record of the proceedings." *Neighbors for Responsive Gov't, LLC v. District of Columbia Bd. of Zoning Adjustment*, 195 A.3d 35, 47 (D.C. 2018) (quoting *Metropole Condo. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 141 A.3d 1079, 1082 (D.C. 2016)). We defer to an agency's own interpretation of its regulations "'unless it is plainly erroneous or inconsistent with the regulations.'" *Id*. (quoting *Metropole Condo. Ass'n*, 141 A.3d at 1082). While we accord deference to a "reasonable" agency interpretation of its regulation, ultimately, "we review the legal conclusions of the agency de novo." *McCormick & Schmick Rest. Corp. v. District of Columbia Alcoholic Beverage Control Bd.*, 144 A.3d 1153, 1155 (D.C. 2016) (internal citation and quotation marks omitted).

## A. The Special Exception

The Board is empowered to grant requests for special exceptions that may be appropriate, but that are not permitted as of right in a given zone. D.C. Code § 6-641.07(g)(2); *Citizens Coal. v. District of Columbia Bd. of Zoning Adjustment*, 619 A.2d 940, 948 (D.C. 1993). Under its special exception review standards, the Board is authorized "to grant special exceptions" when the exception:

> (a) Will be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps;
>
> (b) Will not tend to affect adversely, the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps; and
>
> (c) Will meet such special conditions as may be specified in this title.

11-X DCMR § 901.2. The Board is empowered to grant requests for special exceptions specifically in the R-Use Group D if the application meets the following criteria: (a) the use will not adversely affect the use and enjoyment of the neighborhood; (b) there will be adequate off-street parking to accommodate the maximum permitted occupants who can use the facility at once, provided that: (1) the number of parking spaces complies with the Zoning Regulations and the spaces are located and designed to minimize the disruptions to nearby properties; (2) the

parking spaces and driveways will not be located in a required setback, between the principal building and a right-of-way, nor in a public space abutting the lot; (3) there be a wall or fence between the parking spaces and all contiguous residential property, if there are more than five open parking spaces; and (4) all lighting used to illuminate the parking spaces must be the minimum necessary for reasonable visibility, and must be facing toward the parking spaces. 11-U DCMR § 205.2. If the application meets the above criteria, then ordinarily the BZA is obliged to approve the special exception. *See id.* In the R-16 Zone, where the Property is located, the non-residential uses permitted as a matter of right in all other R zones are allowed only as special exceptions. *Compare* 11-U DCMR § 202 (discussing the matter-of-right uses for R-Use Groups A, B, and C) *with* 11-U DCMR § 204 (discussing the matter-of-right uses for R-Use Group D).[4] For example, in all other R zones, there is an extensive list of matter-of-right uses that include agricultural use, government use, health care facilities, and even the co-location of public schools with other permitted schools. 11-U DCMR § 202.1 (2017). However, for R-Use Group D, which includes the Sixteenth Street Heights neighborhood at issue, the only matter-of-right uses are low-density residential, religious group residences, and community solar facilities. *See* 11-U DCMR § 201 (2019).

---

[4] See *supra* footnote 3.

Furthermore, the R-16 Zone has three principal purposes. 11-D DCMR § 900.1. First, to "[p]romote the conservation, enhancement, and stability of the low-density, single dwelling unit neighborhood for housing and neighborhood-related uses." 11-D DCMR § 900.1(a). Second, to control the expansion of nonresidential uses and minimize adverse impacts of permitted nonresidential uses. *Id*. § 900.1(b). Third, to allow neighborhoods to continue to provide health and social services, and private institutions to provide cultural and religious enrichment "within the framework of improved public review and control over the external effects of nonresidential uses." *Id*. § 900.1(c).

### III.   Discussion

On petition for review, CNDI-LA raises four main issues. First, CNDI-LA maintains that the Board's approval of 107 parking spaces was an unlawful nonconforming use of the Property. Second, CNDI-LA claims that LAMB was not the appropriate applicant to request the special exception. Third, CNDI-LA argues, that during the BZA approval process, the BZA erroneously "abdicated its authority" when it included condition thirty (or the "Alternate Condition") in its order, which conditioned LAMB's future receipt of its certificate of occupancy on its compliance with all of the conditions and regulations as determined by the

Zoning Administrator, and not on the BZA's future approval.[5]  Fourth, CNDI-LA

contends that the BZA did not conduct an "improved public review" as required by

the R-16 zoning regulations.  11-D DCMR §§ 900.1(c), 900.2(b).

## A. The Parking Lot is a Legal Nonconforming Use

CNDI-LA first argues that the Board's order violates the intent and purpose

of the R-16 Zone by grandfathering in and allowing the continued use of a

nonconforming structure, the 107-space parking lot.[6]  We disagree.

---

[5]  As permitted by the Board's order, while co-locating with Kingsbury, LAMB will gradually increase the number of students, faculty, and staff, and eventually phase out Kingsbury until LAMB is the sole occupant of the Property. Specifically, while co-locating, the maximum occupancy will be 485 students (310 LAMB and 175 Kingsbury).  Prior to receiving the certificate of occupancy, LAMB is required pursuant to the Alternate Condition, to demonstrate to the Zoning Administrator its compliance with all applicable conditions.  Once Kingsbury vacates the Property, LAMB will add thirty to fifty students each year, eventually reaching a maximum student population of 600 and a maximum faculty and staff population of 110.  CNDI-LA argues that the Board abdicated its authority in the Alternate Condition by not requiring LAMB to return to the BZA to demonstrate compliance with the conditions and to request the certificate of occupancy.

[6]  CNDI-LA also argues that LAMB's plan to construct a gymnasium (at an indefinite future date) is an impermissible expansion of a nonconforming use, the 107 parking spaces.  We decline to address this issue here because the BZA did not grant LAMB permission to construct the gymnasium, and in fact, the BZA explicitly stated that "[p]rior to construction of the gymnasium, BZA review and approval as a modification is required."  To be clear, the BZA also stated "[t]he

(continued . . .)

A nonconforming use is a use that does not conform to existing zoning regulations but was a lawful use at the time it was created. *George Wash. Univ. v. District of Columbia Bd. of Zoning Adjustment*, 429 A.2d 1342, 1345 (D.C. 1981); *see also Gorgone v. District of Columbia Bd. of Zoning Adjustment*, 973 A.2d 692, 694 (D.C. 2009) (acknowledging nonconforming uses as "uses that were valid at the time the zoning regulations were adopted [and] were allowed to continue even if those uses no longer conformed to the regulations") (citing D.C. Code § 6-641.06a (2001)). In other words, if a use was lawful under applicable zoning regulations at its inception, then that use "may be continued" despite its nonconformity with subsequent zoning regulations, as long as there are "no structural alteration[s]" made, the nonconforming use is not "enlarge[d]," and "a new building is [not] erected." D.C. Code § 6-641.06a (2018 Repl.).

"The government recognizes nonconforming uses in derogation of the general zoning scheme in order to protect the interests of property owners." *George Wash. Univ.*, 429 A.2d at 1345. However, this interest is not absolute. Importantly, there are some noted restrictions on the right to continue a nonconforming use. For example, the right to use a nonconforming structure may

---

(. . . continued)
Board's inclusion of this condition should not be construed as indicating its pre-disposition to grant a request to construct the gymnasium."

be lost if the owner abandons the use. *See, e.g.*, *Gorgone*, 973 A.2d at 694. Additionally, enlargement or expansion of a nonconforming use is impermissible. *See, e.g.*, *Lenkin v. District of Columbia Bd. of Zoning Adjustment*, 428 A.2d 356, 358 (D.C. 1981).

The Board originally permitted the use of a 107-space parking lot under the previous Kingsbury special exception order in 2000. Pursuant to the Kingsbury order, Kingsbury was required to create a parking lot with 107 spaces on the Property to accommodate its occupants, and the determined location of the parking lot was to the south of the Property in what the regulation (passed in 2016) currently requires to be a side yard. *See* 11-U DCMR § 205.2(b)(2). Here, the Board permitted LAMB to continue to use the parking lot as Kingsbury used it because it is a nonconforming use: its use "is an existing situation approved under BZA Order No. 16569 for Kingsbury."

The regulation delineating the special exception uses in R-Use Group D prohibits the parking lot from being "located in a required setback, or on the lot between the principal building and a street right-of-way, nor in public space abutting the lot." 11-U DCMR § 205.2(b)(2). Here, the Board acknowledged that, "[e]ven though some of the parking and driveways are in a required setback and

between the building and a street right-of-way, this requirement under Subtitle U § 205.2(b)(2) was enacted after the BZA['s] approval for Kingsbury that allowed it; thus, the existing situation is permitted to continue as legally nonconforming." There is no indication in the record that LAMB proposed to abandon, enlarge, or otherwise change its use as a parking lot. *See Gorgone*, 973 A.2d at 694 (explaining that to establish abandonment, there must be both an intent to abandon and an overt act or failure to act implying abandonment); *Lenkin*, 428 A.2d at 358 (affirming denial of a petition to enlarge a nonconforming use). The record only indicates LAMB's intent to continue to use the parking lot in the same manner as Kingsbury and not make changes to it.

Thus, because the parking lot was permitted when the Board granted the Kingsbury special exception in 2000, and because LAMB did not request any changes, LAMB's application to use the lot is a legal nonconforming use and the Board did not err in permitting it to remain. *See* D.C. Code § 6-641.06a.

## B. LAMB was the Proper Applicant

CNDI-LA next claims that LAMB was not the appropriate party to request the special exception but that Kingsbury, as the owner of the Property, should have

requested the special exception to co-locate the public charter school.  This argument is unavailing.  Under 11-Y DCMR § 300.4 (2016), "[t]he owner of property for which zoning relief is sought, or an authorized representative, shall file an application with the Office of Zoning."  However, the owner of the property may also give consent for "a third party, including the lessee or contract purchaser of the property . . . to act on the owner's behalf with respect to the application."  *Id*. § 300.5.

The application was originally submitted by LAMB (the prospective lessee of the Property), the Building Hope Parkside Foundation (the contract purchaser of the Property), and Kingsbury (the current owner of the Property).  Because Kingsbury already had an existing special exception application with the BZA, the Office of the Attorney General for the District of Columbia, the District of Columbia Office of Zoning, Kingsbury, and LAMB all agreed that the appropriate action would be to remove Kingsbury from the application – so that Kingsbury could modify its existing application to co-locate with a public charter school – and for LAMB and Building Hope to file their own application.  The Board properly concluded that it was not appropriate for Kingsbury to be a part of LAMB's application because it is already bound by its own special exception application.

Kingsbury's use of the Property is regulated by that application, not by LAMB's application to co-locate its school at the Property.

The Board's order comports with both 11-Y DCMR §§ 300.4 & 300.5. The contract purchaser of the Property, Building Hope, is an applicant on LAMB's special exception application, as is LAMB, the lessee of the Property. *See id.* § 300.4.[7] In addition, the record shows that both LAMB and Kingsbury authorized a third party, the law firm of Goulston & Storrs, to act on their behalf. *See id.* § 300.5. Because the owner consented to a lessee and contract purchaser filing an application on its behalf, the parties complied with 11-Y DCMR §§ 300.4 & 300.5; thus, LAMB was a proper applicant.[8]

---

[7] The sale of the Property was contingent, in part, upon the BZA's approval of LAMB's special exception application because, if LAMB was not given permission to operate the school, funding to operate the school would be in jeopardy and there would be no reason to purchase it. Therefore, while Building Hope was not the current owner of the Property, it was the presumptive owner for the purposes of LAMB's application.

[8] CNDI-LA also puts forth a catchall argument advocating for a remand based on 11-U DCMR § 202.1(n), which allows for the co-location of a public school "with other permitted schools or uses provided all applicable requirements of this title are met." CNDI-LA contends that "all applicable requirements of this title" have not been met because the Board erred in determining that LAMB was a proper applicant and in permitting LAMB to continue to use the parking lot as a nonconforming use. Because we affirm on these issues, we also affirm on CNDI-LA's argument that "all applicable requirements" were not met.

## C. The BZA Did Not Abdicate Its Authority

CNDI-LA next argues that one of the thirty-five conditions, condition thirty, the so-called "Alternate Condition," constitutes an impermissible abdication of the Board's authority. Contrary to CNDI-LA's claim, the BZA did not abdicate any authority. The Alternate Condition contained in the Board's order indicated that, once Kingsbury departs the Property, LAMB "shall provide CNDI-LA and ANC 4C with the certificate of occupancy application and all accompanying documentation at least 90 days before LAMB applies for a certificate of occupancy to expand into the remainder of the building and increase the student and staff count." Further, prior to LAMB's receipt of its certificate of occupancy, it must "demonstrate to DDOT and report to the Zoning Administrator that it is in compliance with the performance monitoring plan (PMP) and demonstrate to the Zoning Administrator that it is in compliance with all other relevant conditions of approval."

Read in context, the BZA's order did not abdicate any authority, as it already unequivocally approved all thirty-five conditions, including LAMB's request to have a maximum of 600 students and 110 faculty and staff as part of another condition, condition twenty-eight. The Board explicitly ruled on and approved

LAMB's request to gradually increase its population, finding that any adverse effects could be mitigated. The inclusion of the Alternate Condition is effectively an additional mechanism for ensuring that LAMB is following the mitigation measures, which is squarely within the BZA's power. *See, e.g.*, 11-X DCMR § 901.4 (The BZA "may impose requirements . . . to ensure compliance with the intent of the Zoning Regulations."). The Board did not err when it included a mechanism for ensuring compliance with its conditions of approval and designated DDOT and the Zoning Administrator to enforce the conditions.

### D. The BZA Provided "Improved Public Review"

The zoning regulations provide that expansion of nonresidential uses or conversion of residential to nonresidential uses in the Sixteenth Street Heights zone must be scrutinized under the framework of an "improved public review." *See* 11-D DCMR §§ 900.1(c), 900.2(b). CNDI-LA argues that an "improved public review" was not undertaken in this case. We disagree.

The concept of an "improved public review" is not defined by the regulation and does not appear anywhere else in Title 11 of the zoning regulations. Giving the phrase its plain meaning, we conclude, under *de novo* review, that the BZA

conducted an improved public review in this case. *See McCormick & Schmick Rest. Corp.*, 144 A.3d at 1155 (stating that we will construe regulations that appear "clear on [their] face . . . according to their ordinary sense and plain meaning" (internal citations, quotation marks, and brackets omitted)). The BZA held public hearings on October 4, November 15, and December 20, 2017, and February 14, 2018, and granted party status to CNDI-LA, a group of neighborhood residents who opposed the special exception. The BZA heard testimony from CNDI-LA, as well as other neighbors who supported the special exception, and reviewed more than sixty letters in support of and in opposition to the application. CNDI-LA also submitted several exhibits, which the BZA accepted into the record. Finally, LAMB proposed thirty-five conditions that it would abide by in order to ensure compliance with the R-16 intent and purpose to mitigate any disturbance in the neighborhood by LAMB's presence. CNDI-LA participated in drafting and negotiating the conditions and provided extensive input throughout the entire special exception process. Because of the extensive review process that the Board undertook, it is clear that the Board fulfilled its regulatory requirements in this case. CNDI-LA provides no legal argument as to what the Board was required to do or should have done that would have satisfied the "improved public review" requirement.

The BZA found that it undertook an improved public review here, and the BZA's interpretation of its own regulation is consistent with our understanding. *Tiber Island Co-op. Homes, Inc. v. District of Columbia Zoning Comm'n*, 975 A.2d 186, 190 (D.C. 2009) ("This court defers to the interpretation by the agency of its own regulations unless plainly erroneous or inconsistent with the regulations." (quoting *1330 Conn. Ave., Inc. v. District of Columbia Zoning Comm'n*, 669 A.2d 708, 714 (D.C. 1995))). From its order, it is clear that the BZA considered "improved public review" to mean the BZA approval process as applied here. For example, in concluding that approval of the special exception was within the intent and purpose of the R-16 Zone, the BZA "recognize[d] that the School is governed by *improved public review* (*this BZA process*)," and also acknowledged that approval would be "within the framework of *improved public review* of and control over the external effects of the School (*this BZA process*)." (emphasis added). Deferring to the BZA's interpretation of its regulation contained in the BZA's order, which is consistent with our interpretation in the context of 11-D DCMR §§ 900.1(c), 900.2(b) and Title 11 of the zoning regulations, the BZA conducted an improved public review prior to granting the special exception. The BZA did so by, in this case, not only granting CNDI-LA party status and allowing it every opportunity to voice its concerns, but also by allowing CNDI-LA to participate in drafting and negotiating the thirty-five

conditions. The Board even conditioned LAMB's future receipt of its certificate of occupancy on LAMB's demonstration to CNDI-LA that it is in compliance with all of the conditions of approval. Finally, CNDI-LA does not cite any authority that might shed further light on the Zoning Commission's intent that would contradict our interpretation. *See Tiber Island Co-op. Homes*, 975 A.2d at 190 ("Absent some compelling indication that the interpretation is erroneous, we are bound by the agency's construction of its own regulations." (quoting *1330 Conn. Ave.*, 669 A.2d at 714)).[9]

## IV. Conclusion

For the foregoing reasons, we affirm the Board's decision to grant LAMB's application for a special exception because its conclusion was based on record evidence that LAMB's proposed use would be in harmony with the purpose and intent of the R-16 Zone. *See* 11-U DCMR § 205.2.

---

[9] We also reject CNDI-LA's related arguments that the Board erroneously permitted Kingsbury to be removed as an applicant and that the Board failed to make adequate factual findings to support its decision to approve the special exception and allow more students at the Property. Petitioner does not raise any additional arguments to support these contentions other than those raised to support the issues we have already discussed. For the reasons previously stated in this section, we affirm on these issues as well and decline to discuss them further.

*Affirmed.*